Milligan, J.,
delivered the opinion of the court:
This claim is made for the sum of $21,750, which it is alleged the government unjustly withholds. The facts on which it rests are found to be: On the 18th of December, 1862, the claimant entered into a charter-party of affreightment with Captain G. B. Ferguson, assistant quartermaster United States Army, whereby the steamer Sylvan Shore was chartered and *218 to freight let to the United States for a period of ten days and as much longer as said vessel may be required by the United States War Department, at tbe price of $200 per day for each and every day said vessel may be employed until she is returned to her owner at New York. The vessel entered the service of the United States on the day of the date of the charter-party, and continued in it until the 12th of December, 1863, when she was discharged.
During this period she was paid the charter rates up to the 1st day of May, 1863, and after that date at the rate of, $100 per day for the remainder of the time.
Under the original charter rate the claimant has received $26,912, and at the reduced rate $17,360, making together the sum of $44,262.
The reduction of the pay of this vessel was made by Captain Ferguson, in pursuance to instructions of the Quartermaster General’s office, dated March 10th, 1863, and May 21st, 1863. These instructions are based on the idea that in the first military operations along the coast and in fitting out great expeditions, it was necessary to pay, for short times, prices much higher than would have been justifiable had it been foreseen that the vessel would remain more than thirty or sixty days under charter. “Many of these vessels,” say the instructions, “have been retained until their earnings and their profits have been excessive.”
Quartermasters are therefore instructed, among whom is Captain Ferguson, “to take stringent measures to reduce these expenses by discharging all steamers whose rates appear to be excessive.”
Acting under these instructions, Captain Ferguson assumed to reduce the chartered rate of the Sylvan Shore from $200 to $100 per day, without the assent and concurrence of the owners. Of this action it does not appear that the claimants had notice until about one month and a half after the order of reduction was made. They were then in the city of Washington, demanding compensation due for the services of the vessel, when they were told that the rate of pay was reduced from the 1st of May, 1863, to $100 per day. They protested against it and demanded the discharge of the vessel. But neither the protest, which was verbal, nor the demand for the discharge of the steamer appears to have been made to any one (although the *219 claimants were in Washington) who had authority to act in the premises.
Subsequently the accounts for the services of the boat were made out at the reduced rates and the money paid over to the claimants, who received it and receipted the accounts thus made out in full, without objection or complaint. The first receipt was dated July 24th, 1863, and from that time forward, from month to month, similar receipts were given until the vessel was finally discharged on the 12th of December, 1863.
During this period the claimants executed seven separate receipts in full without objection or complaint; and since the last receipt, on the 30th of January, 1864, they have slept on their supposed rights, and made no subsequent demand for their adjustment, at the proper executive departments, until the bringing of this suit on the 30th of December, 1868.
This case is one of a class of cases which have been so elaborately discussed and more than once decided by this court at the present term, and therefore it will be needless here again to restate the grounds on which the former decisions were made.
The first question presented is the right of the assistant quartermaster to reduce the rate of compensation fixed in the charter-party without the .assent and concurrence of the owner of the vessel.
This proposition is too plain for argument. On principle as well as the repeated rulings of this court, there can be no alteration, change, or modification in a valid contract by one party to it without the assent and concurrence of the other, either express or implied. The citation of authorities to sustain this proposition'would be useless. It is axiomatic in the law of contracts, and needs no authority or reasoning to sustain it.
This rule of law being admitted, the question next presented is, whether or not the claimant, after the quartermaster had unlawfully and without his assent reduced the wages of the boat, consented to it and by his subsequent acts and conduct ratified and confirmed the change1? The authority to ratify, in the one case, is as clear as the want of authority to bind in the other is certain.
In ratifying a contract made without authority, the law is well settled that the ratification must be made with a full knowledge of all the facts, and by a party competent to act in the premises.
*220 In tbiscase the competency of the claimant to act is not questioned, and although he was dealing with the United States, it is not to be presumed, without proof to the contrary, that he acted under restraint or by coercion. The parties, so far as this record, discloses the facts, stood on .equal grounds, and both are to be presumed to have acted with a full knowledge of their rights under the law.
The fact that the quartermaster assumed to make this reduction of the wages of the vessel retroactive, was fully made known to the claimant, and his remedy for the redress of this wrong and injury known and open to him in this court, but he did not avail himself of it. Had he acted on his rights, and appealed to the law for redress, it is clear from the Quartermaster G-en-eral’s instructions to his acting assistant, Captain Ferguson, that his vessel would have been immediately discharged. This we infer he did not desire. It is true the record shows that he protested against the proposed reduction, and asked the discharge of his boat, but this demand was made of no one who had authority to answer it, although the claimant was then in Washington. It was not prosecuted to any authoritative denial, and the boat afterward left in the service of the government, .without further protest or complaint. The accounts for her wages were made out from May 1st, 1863, at the reduced rate of compensation, and from month to month, up to the 12th of December, 1863, when she was discharged. These accounts were paid monthly, and seven separate and different receqits taken, in full of each, as they were paid, without protestation or complaint.
The effect to be given to these receipts has been the subject of much discussion, and we need only say with respect to them that a receipt is generally only prima facie evidence of the facts they recite, and unless they contain a contract to do something else in relation to the matter about which they are given, they are not conclusive, and may be explained by parol evidence. (1 Greenleafi s Ev., § 305.j But they are always an instrument of evidence, and in the case before us, may be looked to as an act of the claimant tending to ratify and confirm the change made in the contract.
In cases of agency it is a rule of law founded in solid sense and established authority, that a principal must disavow the act of an unauthorized agent beyond his authority promptly, after *221 notice, or be will be bound by it. Bredin v. Dubarry, (14 Sergeant & Rawle, 27-30.) Lees’ Administrator v. Fontaine & Freeman, &c., (10 Alabama, 756.)
But tliis rule does not always prevail in every case, yet whenever a loss may accrue from a delay on the- part of the principal to disavow the agency, it is generally enforced, and like a receipt, in questions of ratification, the fact is always admissible in evidence.
In view of this principle, after notice of the proposed change, it was the duty of the claimants to act promptly and decisively and in good faith, otherwise a loss would accrue to the government on account of their equivocal action. For it can scarcely be questioned that the assistant quartermaster understood the claimants to acquiesce in his reduction of the wages of the boat; otherwise he was guilty of willful disobedience to the orders of the Quartermaster General, winch required him to take stringent measures to reduce the expenses of all steamers under his authority, by discharging those whose rates appear to be excessive. His opinion of the rates of the Sylvan Shore is shown by his attempt to reduce them in advance of the. interview with her owners; and when they objected to the reduction, the only alternative left him was to recommend her discharge. This was not done, nor was the demand prosecuted to any authoritative decision. The boat was left in the service, and they accepted and receipted for her wages at the reduced rates, without further protest or complaint.
It is clear if this was not done in good faith, but as a piece of strategy to retain the vessel in the service for the time, and after her discharge to claim the original contract price, it was a most palpable deceit and fraud on the government, on account of which there could be no recovery in this court.
But we do not impute such dishonorable motives to the claimants. Their acts speak another language, and by every rule of law and just interpretation of evidence, iu the opinion of a majority of the court, satisfactorily establish a ratification and acquiescence in the change of the contract, and forever close the mouths of the claimants from alleging to the contrary.
The case of Thomas Clyde for compensation for the boats Rebecca Clyde and Emilie (ante p. 141) is, in its facts and circumstances, somewhat similar to this case, and the reasons of *222 the court and citations of authority there given are relied on to sustain the view we have taken of this case.
We find for the defendants, and order that the petition be dismissed.